THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

Y.E.C.,

Defendant.

Criminal No. 15-597 (ADC)

## OPINION & ORDER

I.  Case Background and Nature of the Charges Filed

On September 17, 2015, a four-count Information was filed against juvenile defendant Y.E.C., charging three violations to Title 18 U.S.C. § 2119(1) (carjacking) and one violation of 18 U.S.C. § 1951 (aiding and abetting a robbery). ECF No. 3. Specifically, the Information alleges that in violation of § 2119(1), on September 15, 2015, with the intent to cause serious bodily harm, Y.E.C. took a 2009 Hyundai Accent by force, violence and intimidation. The Information further alleges that one day later, on September 16, 2015, Y.E.C. committed two more violations of § 2119(1) in the same manner, that is, by force, violence, and intimidation, taking: (1) a 2014 Toyota Yaris; and (2) a 2015 Nissan Versa. Finally, the Information also charges that, on September 16, 2015, Y.E.C. violated § 1951 by aiding and abetting a robbery of a food and beverage truck, in which the food truck's employees were also threatened by force, violence, and fear of injury. ECF No. 3.

Pursuant to 18 U.S.C. § 5032, on September 17, 2015, the United States of America ("government") filed a Certification to proceed under the Juvenile Justice and Delinquency Prevention Act. **ECF No. 4.** After being appointed a Federal Public Defender, on September 17, 2015, a detention hearing was held before U.S. Magistrate Judge Camille L. Vélez-Rivé, who ordered that, given the nature of the charges, Y.E.C. be detained without bail. **ECF Nos. 6-8.**

On October 8, 2015, the government filed a motion seeking to transfer Y.E.C. to adult status in order to enable adult criminal prosecution. **ECF No. 12.** At a hearing held on October 26, 2015, this Court: (1) granted the government's request for disclosure of juvenile records, if any, before the Juvenile Courts of the Commonwealth of Puerto Rico (**ECF No. 13**); and (2) ordered the psychological evaluation of Y.E.C. (**ECF No. 14**). At the hearing, the government informed the Court that it had retained Dr. Jaime Grodzinski to conduct its psychological evaluation. **ECF No. 14.** Meanwhile, the Assistant Federal Public Defender announced that it had retained Dr. Carol Romey. *Id.* Upon receipt of the Juvenile Court's records and the psychological evaluation reports, a transfer hearing was held on March 8, 9, and 14, 2016. **ECF Nos. 44-45.**

II.     **Transfer Criteria for Criminal Prosecution**

Title 18 U.S.C. § 5032 specifically provides:

> A juvenile who is alleged to have committed an act of juvenile delinquency and who is not surrendered to State authorities shall be proceeded against under this chapter unless he has requested in writing upon advice of counsel to be proceeded against as an adult, except that, with respect to a juvenile fifteen years or older alleged to have committed an act after his fifteenth

birthday which if committed by an adult would be a felony that is a crime of violence . . . criminal prosecution on the basis of the alleged act may be begun by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after hearing, such transfer would be in the interest of justice. . . .

In addition, § 5032 directs federal judicial officers to consider six (6) factors relating to the juvenile and the nature of the offense charged in order to determine whether a juvenile's transfer to adult status is warranted. These six (6) factors include:

1. the age and social background of the juvenile;

2. the nature of the alleged offense;

3. the extent and nature of the juvenile's prior delinquency record;

4. the juvenile's present intellectual development and psychological maturity;

5. the nature of past treatment efforts and the juvenile's response to such efforts; and

6. the availability of programs designed to treat the juvenile's behavioral problems.

18 U.S.C.A. § 5032 (West).

In considering the nature of the offense, the court shall consider the extent to which the juvenile played a leadership role in an organization, or otherwise influenced other persons to take part in criminal activities, involving the use of or distribution of controlled substances or firearms. *Id.* Such factor, if found to exist, shall weigh in favor of a transfer to adult status, but the absence of this factor shall not preclude such a transfer. *Id.*

At the transfer/evidentiary hearing the judicial officer may exercise his or her discretion "to assume the truth of the allegations in the juvenile information and to consider other evidence about the specifics of the alleged offense." *United States v. Y.C.T., Male Juvenile*, 805 F.3d 356, 358 (1st Cir. 2015). In the absence of explicit language assessing the weight to be given to each of the six (6) previously enumerated factors, the guiding principle in transfer proceedings is whether the alleged delinquent's transfer would be in the best interest of justice. *See* 18 U.S.C. § 5032; *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984). "Although the court must address each factor, the district court is not required to state whether each specific factor favors or disfavors transfer. Rather, the court must balance the evidence before it, weighing each factor as it sees fit, to determine whether a transfer to adult status best serves the interest of justice." *United States v. Male Juvenile E.L.C.*, 396 F.3d 458, 461-62 (1st Cir. 2005) (internal citations and quotations omitted).

### III.    The Evidentiary/Transfer Hearing

At the transfer hearing, the government presented the testimonies of four witnesses: (1) Contract Specialist Daryl P. Cash, from the Federal Bureau of Prisons; (2) Mrs. Juana Ocasio-Moyet, a victim of one of the three carjackings; (3) F.B.I. Task Force Officer Víctor López-Acosta; and (4) Clinical Psychologist and Neuropsychologist Dr. Jaime Grodzinski. The defense presented three witnesses: (1) Mrs. Carmen Cruz, Y.E.C.'s mother; (2) Social Worker Ana Cruz-Marquez; and (3) Clinical Psychologist Dr. Carol Romey.

Based on the evidence presented, the analysis and findings as to each of the six factors previously enumerated in § 5032 follows:

### A. Age and Social Background[1]

Y.E.C. was born on April 13, 1998 and was seventeen (17) years and five (5) months old at the time of the offenses in question. On March 8, 2016, when the transfer hearing before this Court began, Y.E.C. was approximately one month away from his eighteenth birthday. Y.E.C. was raised solely by his mother, and met his father for the first time at age seven (7). His mother never worked and obtained only a sixth grade education. Y.E.C.'s family lives in extreme poverty. The family derives its income from welfare coupons and Y.E.C. stated that his family would run out of food at the end of each month. Y.E.C. has one brother and three sisters. He is the fourth of five siblings on his mother's side. Y.E.C. informed the government's expert psychologist, Dr. Grodzinski, that during his childhood, he had friends and played all kinds of games.

With respect to education, Y.E.C. claims to have finished ninth grade, but later stated that he left school after eighth grade at age thirteen (13). Thereafter, he never returned to any formal education program. According to Y.E.C.'s mother, Y.E.C. reached eighth grade, but failed it twice.[2] Subsequently, Y.E.C. passed a placement test, which moved him up to the tenth grade. At that time, Y.E.C.'s mother claims that he started tenth grade, but she had to remove him for a program, Crearte, which he never finished.

---

[1] Most of the information concerning Y.E.C.'s social and family background was obtained from psychological evaluations authored by the government's expert, Dr. Jaime Grodzinski (**ECF No. 24-1**), and the defense's expert, Dr. Carol Romey (**ECF No. 25-1**). In addition, some information was obtained from the testimony of Y.E.C.'s mother.

[2] The defense's expert, Dr. Carol Romey, reports that Y.E.C. stated he failed eighth grade three times, not two. **ECF No. 25-1** at 3.

Y.E.C. stated to Dr. Grodzinski that he exhibited fast learning skills at school for writing, reading, and basic math. **ECF No. 24-1**. While in school, purportedly in seventh grade at age thirteen (13), Y.E.C. was treated for depression and attention deficit disorder. However, shortly thereafter, he stopped taking his medication and discontinued treatment because the medication was making him "feel dumb."

Y.E.C. stated that he has worked in different jobs including painting, washing cars, and gardening. He also spent significant time with a neighbor who taught him motorcycle mechanics. Y.E.C. has never been married, had a relationship for eight months, and has no children. Y.E.C. claimed that he has no history of legal and/or illegal drug abuse.

### B. Nature of the Alleged Offense

At the evidentiary hearing, the government produced two witnesses to provide testimony about the crimes Y.E.C. allegedly committed: one carjacking on September 15th; and two carjackings and the robbery of a food truck on September 16th. Mrs. Juana Ocasio-Moyet ("Ms. Ocasio-Moyet"), a seventy-two (72) year old victim of one of the September 16th carjackings, provided testimony about that incident. Meanwhile, F.B.I. Task Force Officer Víctor López-Acosta ("T.F.O. López-Acosta"), who has worked with the Task Force for sixteen (16) years, provided detailed testimony of his interview of Y.E.C., in which Y.E.C. admitted and explained his participation in each of the four crimes charged.

According to T.F.O. López-Acosta, Y.E.C. explained that on the night of September 15, 2015, Y.E.C. contacted Brian Rodríguez-Rivera ("Mr. Rodríguez-Rivera") by phone and asked to be picked up. Shortly thereafter, Mr. Rodríguez-Rivera picked up Y.E.C. on a

motorcycle and drove to the Buena Ventura development in Yabucoa. After spotting a burgundy Hyundai at the entrance of the development, they approached the vehicle. At that point, Y.E.C. put on a black, red, and white clown mask he had taken with him and approached the driver of the vehicle with a starter gun.³ Using the starter gun, Y.E.C. tapped the driver's side window to get the driver out of the vehicle. Once the driver was removed, Y.E.C. drove the vehicle – with Rodríguez-Rivera following him by motorcycle – to an area in the Municipality of Yabucoa. After leaving the vehicle in an empty lot, Y.E.C. returned home.

Y.E.C. also informed T.F.O. López-Acosta that the next morning, on September 16, 2015, he called a friend to come pick him up on the motorcycle so that they could return to the stolen burgundy Hyundai. Thereafter, Y.E.C. – together with Juan M. Rivera Franco and his older brother, Edmanuel Echevarría-Cruz – drove the stolen burgundy Hyundai to the Municipality of San Lorenzo. There, they targeted a 2015 Toyota Yaris, driven by seventy-two (72) year old, Ms. Juana Ocasio-Moyet. Using the same mask and starter gun he used to rob the burgundy Hyundai the day prior, Y.E.C. approached the vehicle and removed Ms. Ocasio-Moyet from her vehicle. According to Ms. Ocasio-Moyet's testimony, a masked man grabbed her by the arm and told her "get out bitch or I'll burn you." After Ms. Ocasio-Moyet was removed from the car, Y.E.C. drove the stolen 2015 Toyota Yaris, while the other co-participants followed behind in the stolen burgundy Hyundai.

---

³ T.F.O. López-Acosta explained that a "starter gun" is: "one of these pistols that is used in races in which it looks real, the weight is the same or similar, and close or at a distance it looks like a real gun. It does not shoot the projectile, it has the casings but it is just to make the sound so that it can emit that sound." *See* Transcript, March 9, at 18.

Y.E.C informed T.F.O. López-Acosta that after carjacking the 2015 Toyota Yaris, they returned the stolen burgundy Hyundai to where it had been parked the night before. Next, they took the stolen 2015 Toyota Yaris to go pick up Mr. Rodríguez-Rivera. Together, the four co-participants traveled to the Municipality of Maunabo, where they robbed two women working at a food truck parked in front of a school. According to T.F.O. López-Acosta, Y.E.C. informed him that while wearing masks, he pointed the starter gun at the two women – while Mr. Rodríguez-Rivera threatened them with a tire iron – to rob the women of their purses and approximately $800. The two victims, who were interviewed by the F.B.I., corroborated the manner and means in which the robbery occurred.

Y.E.C. also informed T.F.O. López-Acosta that, after the food truck robbery, the four co-participants headed to Yabucoa, where they spotted a Nissan Versa in front of a home for the elderly. The vehicle was occupied by Mr. Franco Acosta, a sixty-three (63) or sixty-four (64) year old man. Using the same modus operandi exhibited in the two previous carjackings, Y.E.C. approached the vehicle wearing a mask and used the starter gun to bang on the window to remove the victim. Y.E.C. then took control over the vehicle and drove away, with the other co-participants following behind. Subsequently, one of the co-participants, Mr. Rodríguez-Rivera, switched vehicles by exiting the stolen 2015 Toyota Yaris to join Y.E.C. in the stolen Nissan Versa.

Thereafter, a police chase ensued down road 901, headed from Maunabo into Yabucoa. During the chase, the Nissan Versa lost control and crashed. Both Y.E.C. and

Mr. Rodríguez-Rivera were immediately arrested at the scene, and according to T.F.O. López-Acosta, the Nissan Versa was a "total loss." The other two co-participants were arrested further down the road, where Puerto Rico Police were able to stop and apprehend them. When the suspects were apprehended, the police seized backpacks containing masks, a device to cut padlocks, and a starter gun. Based upon his investigation, T.F.O. López-Acosta concluded that, in all instances, Y.E.C. "was the initiator of all the events" and the one "who directly intervened with the victims."

### C. Juvenile's Prior Delinquency Record

According to Y.E.C.'s juvenile records, on August 7, 2014, at age sixteen (16), Y.E.C. was convicted in the juvenile court for the District of Humacao, Puerto Rico, for driving a motorcycle without a registration sticker and for not possessing a driver's license.[4] After pleading guilty to these charges, Y.E.C. was placed in a juvenile diversion program, which concluded on April 13, 2015. Despite his placement in the program and suffering lenient consequences for the motorcycle offense, Y.E.C. committed the instant offenses less than five months after the charges were dismissed.

### D. Juvenile's Intellectual Development and Psychological Maturity (ECF Nos. 24-1 and 25-1)

Y.E.C. was evaluated by two psychologists who performed a series of psychological and neuropsychological assessments. The first evaluation was performed by the

---

[4] As the government has indicated, no information has been produced explaining why Y.E.C. was allowed to drive an unregistered motorcycle on a public highway or who was the legal owner of the motorcycle. ECF No. 56 at 12-13.

government's expert, Dr. Grodzinski, when Y.E.C. was seventeen (17) years and six (6) months old. Dr. Grodzinski found Y.E.C. to have an average intellectual development and psychological maturity, as well as an average intelligence quotient. **ECF No. 24-1**. Dr. Grodzinski also concluded that there were no indications of any current or prior mental health problems. Although he acknowledged that Y.E.C. reported moderate to severe depression and anxiety, Dr. Grodzinski explained that Y.E.C.'s symptoms were unrelated to any major depressive disorder or any kind of generalized anxiety disorder. Instead, Dr. Grodzinski stated that Y.E.C.'s symptoms are attributable to his current legal situation and are manageable. Dr. Grodzinski concluded his testimony by stating that Y.E.C. is a very capable man with a good: (1) understanding of things; (2) memory recall; and (3) ability to solve life problems.

The defense's expert, Dr. Romey, who evaluated Y.E.C. on December 1, 2015, provided a very different opinion regarding Y.E.C.'s mental health. She claims that through her interview with Y.E.C., she was able to conclude a mental health diagnosis of Schizoaffective Disorder, Bipolar Type. **ECF No. 25-1**. Dr. Romey stated it is possible that Y.E.C. may have been misdiagnosed with depression and attention deficit disorder while experiencing symptoms of Schizoaffective Disorder since early childhood. Dr. Romey's opinion, however, is inconsistent with all previous statements made by Y.E.C. regarding his mental condition and is strongly contested by Dr. Grodzinski and the government. Indeed, even Y.E.C.'s own mother stated that she never noticed anything extreme about

Y.E.C.'s conduct as a child that would prompt her to seek help for any mental health condition other than attention deficit disorder.

Dr. Grodzinski challenged Dr. Romey's diagnosis that Y.E.C. suffers from psychoaffective bipolar disorder by stating that Dr. Romey's report is missing critical information to make such a determination. Dr. Grodzinski claims that Romey's report is unreliable, and is merely an estimation, because it: (1) lacks a clinical evaluation as to Y.E.C.'s mental status at the time he was evaluated; and (2) does not contain any corroborating psychological or pathology history provided by anyone other than Y.E.C. Similarly, the government contests Dr. Romey's conclusions by highlighting that she did not: (1) examine Y.E.C.'s psychological or Department of Education records; (2) interview his mother or siblings, despite acknowledging in a previous juvenile transfer hearing that such interviews were beneficial to making a juvenile transfer assessment; (3) interview the victims, despite doing so in another juvenile transfer hearing; (4) take into consideration the actions of Y.E.C. in the instant case when reaching her diagnosis; and (5) corroborate any of the information she obtained from Y.E.C. **ECF No. 56** at 18-19.

In light of the above, the Court finds Dr. Grodzinski's testimony and conclusions to be far more credible than Dr. Romey's. Because no evidence of any type of bipolar disorder exists prior to Y.E.C.'s interview with Dr. Romey, the Court adopts Dr. Grodzinski's medical opinion that Y.E.C possesses an average intellectual development and psychological maturity and does not suffer from any mental health problems.

### E. Nature of Past Treatment

The evidence indicates that, at age eleven (11), Y.E.C. was placed in the Special Education Program of the Puerto Rico Department of Education, due to difficulties in Spanish and math. However, he was subsequently dropped from the program due to absenteeism. Thereafter, Y.E.C. was evaluated by professionals from the APS healthcare system where he was diagnosed with Attention Deficit Disorder with Hyperactivity.[5] Although Y.E.C. was prescribed medication, he decided to discontinue it because he did not like its side effects.

As already discussed, with respect to Y.E.C.'s criminal rehabilitation, after Y.E.C. was arrested for driving a motorcycle without a registration sticker and license, he completed a juvenile diversion program. However, less than five months after the charges were dismissed, Y.E.C. committed the instant offenses.

### F. Availability of Programs Designed to Treat the Juvenile's Behavioral Problem

At the hearing, the government presented Daryl P. Cash ("Mr. Cash") from the Federal Bureau of Prisons, who recommended that, under the circumstances, Y.E.C. would be more appropriately placed in a federal adult prison as opposed to a federal juvenile facility. Mr. Cash explained that in juvenile institutions all programs are mandatory, while in adult institutions the participants determine which programs they will attend. He also explained that because the vocational programs are more numerous and of greater variety in adult institutions, they would serve Y.E.C. better upon release. Because Y.E.C.

---

[5] APS is the mental healthcare provider for the beneficiaries of the health insurance of the Commonwealth of Puerto Rico.

has been out of school for an extended period and is essentially functioning as an adult, Mr. Cash believes that placing Y.E.C. back into a juvenile role, where he would be told what programs to attend, could be particularly challenging for Y.E.C. In addition, he explained that juvenile facilities cater more to juveniles who have committed crimes under the influence of alcohol or drugs, and that an individual who is more criminalized might not be as easily programmed and amenable to treatment in a juvenile facility. Lastly, Mr. Cash expressed concern about a juvenile facility's ability to control an individual who assaults a staff member or peer, due to a new Executive Order which prohibits segregation of the assailant.

The defense presented the testimony of Ana Cruz-Márquez ("Ms. Cruz-Márquez"), a social worker who has worked with Y.E.C. at the Bayamón Detention Center where Y.E.C. has been detained since his apprehension. During her testimony, Ms. Cruz-Marquez never opined as to whether placement in a federal juvenile or adult facility would be more beneficial to Y.E.C. Instead, she admitted that she does not know what types of treatment options are available at a federal juvenile facility because she works in a state facility. Ms. Cruz-Márquez did, however, state that Y.E.C. is a person who shows some level of maturity and would benefit from some form of a structured environment. She also explained that, throughout her time working with Y.E.C., he has consistently followed the rules, exhibited a calm mood, and shown a great deal of respect.

IV.  Conclusion

It is not without deep concern and regret that, on a daily basis, members of our society, mainly youngsters, elect to go astray. They depart from family and community moral values and teachings, abandon school, succumb to peer pressure, and rapidly deteriorate. Occasionally, without visible signs of such deterioration, they scale into acts of violence which place the community and their physical integrity in danger.

At the time the offense was committed, Y.E.C. was seven (7) months short of attaining his eighteenth birthday. Although not financially capable of being independent, Y.E.C. acted as an adult by leaving the house when he pleased and terminated his formal education. In addition, despite possessing an average intellectual development and psychological maturity for his age, the severity of Y.E.C.'s criminal conduct on September 15-16, 2015, place him in a violent category far beyond his peers. Such violent crimes – three armed carjackings and one armed robbery – are far beyond the severity of other acts of juvenile delinquency that are being taken to Juvenile Court on a daily basis. Moreover, it must be taken into account that Y.E.C. did not just engage in one violent crime. Rather, from the evidence presented, it is clear that Y.E.C. was the ringleader and lead assailant involved in all four violent crimes committed over a mere two day period.

The strength of the government's evidence – including Y.E.C.'s admissions to T.F.O. López-Acosta about his participation and role in each of the crimes, Y.E.C.'s arrest after a police car chase wherein he occupied one of the stolen vehicles, and the police's recovery of masks and a starter gun during his and his co-participants arrest – is overwhelming.

In this case, there is no evidence that Y.E.C. could have been disoriented as to time and space, unaware of the logical consequences of his acts, or otherwise suffering from a mental defect or impairment of a neurological condition. To the contrary, through Y.E.C.'s psychological evaluation, it has been determined that his intellectual functioning is "average" when compared to those in his normative age group. Y.E.C.'s personality profile is within the expected behavioral and intellectual parameters.

The Court recognizes that the purpose of the Juvenile Delinquency Act is "to be helpful and rehabilitative rather than punitive, and to reduce, at least to some extent, the stigma of criminal conviction." 18 U.S.C.A. § 5032 (West) (*citing United States v. Hill*, 538 F.2d 1072, 1074 (4th Cir. 1976)). In cases where the juvenile's potential for rehabilitation is good, and facilities exist so as to allow the juvenile's potential to be realized, it is not in the interest of justice to transfer to adult status. *United States v. B.N.S.*, 557 F. Supp. 351, 353 (D. Wyo. 1983); *see also United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002) ("In evaluating a defendant's potential for rehabilitation, the district court should consider whether there is a 'likelihood' that rehabilitation will work in his or her case."). However, the transfer of a juvenile to adult status is to be determined in accordance with the best interests of justice. *United States v. Male Juvenile E.L.C.*, 396 F.3d 458, 462 (1st Cir. 2005); *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984). In making such a determination, "[t]he district court must balance these important interests against 'the need to protect the public from violent and dangerous individuals.'" *United States v. Male Juvenile E.L.C.*, 396

F.3d 458, 461 (1st Cir. 2005) (*quoting United States v. Juvenile Male #1*, 47 F.3d 68, 71 (2nd Cir. 1995)).

Having evaluated the evidence presented and the six criteria enunciated under 18 U.S.C. § 5032, the Court concludes that all six factors weigh in favor of transferring Y.E.C. from juvenile to adult status. Pursuant to § 5032 and case law, factors that weigh in favor of transfer are: (1) Y.E.C.'s proximity to age eighteen (18) at the time the offenses were committed and at the time of the transfer hearing; (2) the numerosity, intensity, and severity of the four crimes committed over a two-day period; (3) Y.E.C.'s leading role as the primary assailant in each crime; (4) Y.E.C.'s prior juvenile delinquency record and the futility of prior juvenile rehabilitative efforts to deter Y.E.C. from engaging in far more serious crimes after treatment; (5) Y.E.C.'s present psychological maturity and development; and (6) the greater potential for rehabilitative success and vocational opportunities in an adult institution as opposed to a juvenile facility.

Moreover, given the seriousness of the offenses charged, the circumstances and manner in which the same were committed, and the juvenile's leading role during the events of September 15-16, 2015, the Court holds that the nature of the offenses alone makes transfer to adult status warranted. *See United States v. Y.C.T. Male Juvenile*, No. CRIM. 13-235 FAB, 2013 WL 11025848, at *3 (D.P.R. Nov. 22, 2013), *aff'd*, 805 F.3d 356 (1st Cir. 2015) (holding that "[m]any courts have granted transfer based on the violent nature of the offense itself in cases involving carjacking or armed robbery, such as this case . . . [where] [t]estimony by Special Agent Gonzalez at the transfer hearing indicated that

Y.C.T. participated actively in the commission of the crime, used a toy gun to intimidate the victims, drove the carjacked vehicle, demanded money from the victims, assaulted the male victim inflicting a wound, threatened to kill both victims, and sexually assaulted the female victim."); *United States v. R.I.M.A.*, 963 F. Supp. 1264, 1271 (D.P.R. 1997) (holding that the seriousness of carjacking and bank robbery with a weapon, as well as the juvenile's active role in offense, was determinative in juvenile's transfer to adult status); *see also United States v. Smith*, 178 F.3d 22, 26 (1st Cir. 1999) (holding that no court of appeals has found that a district court abused its discretion in transferring a juvenile to adult status for the crime of armed robbery or for the crime of armed carjacking). In this case, Y.E.C. was the lead assailant in three carjackings and a robbery, in which he used a starter gun to intimidate his victims to give up their property. Accordingly Y.E.C.'s transfer from juvenile to adult status is warranted.

Based on the foregoing, the government's Motion to Transfer Juvenile Defendant to Adult Status (**ECF No. 12**) is **GRANTED**.

**SO ORDERED.**

At San Juan, Puerto Rico, on this 5th day of December, 2016.

S/AIDA M. DELGADO-COLÓN
**Chief United States District Judge**